### IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) AUSTIN BOND, as Personal Representative of the Estate of BRAD LANE, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>(1) OKLAHOMA COUNTY CRIMINAL JUSTICE AUTHORITY,<br>(2) BOARD OF COUNTY COMMISSIONERS FOR OKLAHOMA COUNTY,<br>(3) MELISSA WOOD,<br><br>Defendants. | CASE NO.: CIV-23-05-D<br><br>Attorney Lien Claimed<br><br>Jury Trial Demanded |

### COMPLAINT

**COMES NOW**, the Plaintiff Austin Bond, as Personal Representative of the Estate of Brad Lane, deceased, and for his Complaint against the above-named Defendants, states and alleges as follows:

### PARTIES

1. Plaintiff Austin Bond, as Personal Representative of the Estate of Brad Lane ("Mr. Lane"), deceased, is a citizen of the State of Oklahoma and the Personal Representative of Mr. Lane's Estate.

2. Defendant Oklahoma County Criminal Justice Authority ("OCCJA" or "Jail Trust") is a public trust created for the furtherance of purported public functions pursuant to 60 Okla. Stat. § 176, *et seq.* OCCJA was created by a certain "Trust Indenture." Under the Trust Indenture, OCCJA is to "assist" Oklahoma County in its stated objective of operating the Oklahoma County "Jail Facilities", which includes the Oklahoma County

1

Detention Center ("Oklahoma County Jail" or "Jail"). Under the Trust Indenture, OCCJA was delegated the responsibility of developing policies and procedures to address the administration of the Jail. However, the Trust Indenture specifically provides that the Oklahoma County Sheriff was to continue operating the Jail until such time as the OCCJA and Oklahoma County had entered into a lease agreement and/or funding agreement(s) that specifically provided for the OCCJA to commence responsibility for management and operation of the Jail. OCCJA did not take over responsibility for management and operation of the Jail until June 1, 2020. However, since June 1, 2020, OCCJA has remained the County entity with primary responsibility for the management and operation of the Jail. The Oklahoma County Sheriff and a member of the Oklahoma County Board of County Commissioners are permanent members / trustees of the OCCJA. OCCJA is sued under Plaintiff's municipal liability theory.

3. Defendant Board of County Commissioners for Oklahoma County ("Board", "BOCC" or "Oklahoma County") is the legislative entity with non-delegable statutory responsible for providing a jail facility for Oklahoma County, Oklahoma that is adequate for the safe-keeping of inmates at the Jail. *See* 57 O.S. § 41. As a matter of Oklahoma law, BOCC exercises the powers of the county. *See* 19 Okla. Stat. § 3. A suit brought against BOCC is the way Oklahoma law contemplates suing the county. *See* 19 Okla. Stat. § 4. BOCC is charged with ensuring that the Jail has adequate funding and resources to provide constitutionally sufficient conditions of confinement.

4.      Defendant Melissa Wood ("Wood" or "Officer Wood") is a citizen of Oklahoma. Wood was, at all times relevant hereto, acting under color of state law as employee and/or agent of Oklahoma County/OCCJA.

## JURISDICTION AND VENUE

5.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and/or Fourteenth Amendment(s) to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under the color of law.

6.      This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and/or Fourteenth Amendment(s) to the United States Constitution and 42 U.S.C. § 1983.

7.      The acts complained of herein occurred in Oklahoma County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

## FACTUAL BACKGROUND

**Facts Specific to Mr. Lane**

8.      Paragraphs 1-7 are incorporated herein.

9.      On January 2, 2021[1], Mr. Lane was brutally beaten to death by his cell mate, Shaquile Brown.

---

[1]     As January 2, 2023 was a Holiday, the statute of limitations for Plaintiff to file his Complaint is January 3, 2023.

3

10. Mr. Lane was booked into the Oklahoma County Jail on December 11, 2020. He was a pretrial detainee.

11. On book-in, Mr. Lane was wearing a walking boot for broken leg he suffered in a motorcycle crash.

12. As of January 2, 2021, Mr. Lane was being housed on the 13th floor of the Jail in a cell with inmate Shaquile Brown, a known violent offender. For example, Brown had multiple prior convictions for violent crimes such as assault and battery, and assault and battery and assault and battery on a police officer, and was being held in the Jail in January 2021 on multiple charges, including two counts of aggravated assault and battery. By contrast, Mr. Lane was charged with nonviolent crimes.

13. On the evening of January 2, Inmate Brown began to physically attack and beat Mr. Lane with his own walking book.

14. When the beating began, Mr. Lane immediately began screaming in pain and begging for help.

15. Inmates in the pod heard Mr. Lane scream: 'He's killing me, help me, he's killing me!"

16. Mr. Lane's screams started after detainees/inmates received their evening meal trays. However, there were no detention officers on the 13th floor when the assault began.

17. Gravely concerned for Mr. Lane's safety, another inmate on the 13th floor called for help three times from the phone in his cell, which connected to jail medical staff, but there was no answer.

4

18. Locked in his cell, and realizing there was no Jail staff on the floor to stop the assault, another inmate on the floor, Christopher Autrey, could only verbally encourage Mr. Lane to "fight back".

19. The brutal beating of Mr. Lane went on for approximately 40 minutes. During this 40 minutes, Mr. Lane repeatedly screamed for help, to no avail. There was no detention staff on the floor to respond to his pleas.

20. During the assault, Inmate Brown savagely bludgeoned Mr. Lane with the boot all over his body, head and face.

21. Finally, around 40 minutes after the Mr. Lane began screaming, Officer Wood came to the pod on the 13th floor. Officer Wood noted that there was blood all over the cell and Mr. Lane was unresponsive.

22. A medical emergency was called at around 7:10 p.m.. However, an additional ten (10) minutes passed before two nurses, Brenda Pierce, RN and David Muniz, LPN, were permitted to access Mr. Lane's cell.

23. Detention officers on the scene, would not allow the nurses access to Mr. Lane because inmate Brown was "acting out". These officers, while keeping the nurses from accessing the cell, opened the cell door and deployed pepper spray. This obstruction of the nurses constitutes deliberate indifference to a serious medical need.

24. At around 7:20 p.m., Nurses Pierce and Muniz entered the cell. The cell was covered in blood. There was the puddle of blood on the floor, plus blood smeared everywhere all over the cell. Mr. Lane's head was resting in a "copious" amount of blood. Many of his teeth had been knocked out. Mr. Lane had no pulse and no respirations. His

5

body was cold to touch and stiff. The left side of Mr. Lane's head and neck was black and purple in color. He had numerous lacerations to his head.  Mr. Lane was subsequently pronounced dead.

25. He was just 40 years old at the time of his death.

26. Inmate Brown confessed to killing Mr. Lane and was charged with his murder.

27. While the Oklahoma Jail Standards and Jail policy require officers to visually check on detainees/inmates in their cells at least once an hour, Officer Wood, who was assigned to the 13th floor that night, admittedly failed to perform any visual checks from 6 p.m. and 7 p.m., at least, allegedly because she was busy escorting another inmate to the medical clinic.

28. The 13th floor was left without any supervising officer on the evening of January 2 due to the long-standing custom and practice of understaffing and overcrowding at the Jail.

29.  The Eighth Amendment and Fourteenth Amendment alike require that inmates and detainees be provided reasonably adequate conditions of confinement. The right to be protected against violence committed by other inmates is part of the conditions of confinement requirement afforded by the United States Constitution.

30. Any reasonable Jail employee knew or should have known those rights at the time of the complained of conduct as they were clearly established.

31. Officer Wood failed to protect Mr. Lane from harm by leaving the 13th floor of the Jail unsupervised for at least an hour, with knowledge that Lane was housed with a known violent offender.

32. In addition, the failure to provide any supervision of the 13th floor during the assault and after Mr. Lane repeatedly screamed for help constitutes deliberate indifference to Mr. Lane's health and safety.

33. With deliberate indifference, Officer Wood failed to protect Mr. Lane from harm, and disregarded the known, obvious and excessive risks of harm to Mr. Lane.

34. As a direct proximate result of Officer Wood's unlawful conduct, Mr. Lane suffered actual and severe physical injuries, physical pain and suffering and emotional and mental distress and death.

- **County Policies and Customs**

35. Paragraphs 1-34 are incorporated herein.

36. There is an affirmative link between the aforementioned unconstitutional acts and/or omissions of Officer Wood and policies, practices and/or customs which Oklahoma County/OCCJA promulgated, created, implemented and/or possessed responsibility for.

37. To the extent that no single officer violated Mr. Lane's constitutional rights, Oklahoma County/OCCJA are still liable under a theory of a systemic failure of Oklahoma County/OCCJA policies and procedures as described below. There were such gross deficiencies in staffing, facilities and procedures that Mr. Lane was effectively denied constitutional conditions of confinement.

38. From its inception in 1991, the Jail has been systemically deficient. Overcrowding, understaffing, inadequate security and supervision, excessive use of force by staff and assaults have been constant.

39. Following a lengthy investigation, in 2008, the U.S. Department of Justice issued a report on conditions of confinement at the Jail. The DOJ found woefully inadequate supervision and staffing at the Jail, a lack of basic medical and mental health care, overcrowding and a high rate of inmate assaults and deaths.

40. A copy of this DOJ Report was sent to Defendant BOCC or Jail Trust, in their official capacity by sending it to John Whetsel, Oklahoma County Sheriff in 2008, as well as the Oklahoma County District Attorney and the United States Attorney for the Western District. As such, Defendants BOCC and Jail Trust were on notice and aware of the constitutional deficiencies addressed by the DOJ Report.

41. Defendants BOCC and Jail Trust were aware prior to December 2020 that "the excessive number of detainees in close quarters contributes to issues such as ***increased violence among detainees*** and the grossly unsanitary condition of the cells." (DOJ Report, n. 4).

42. The shortage of staff at the jail has contributed to a lack of control over the inmates at the Jail.

43. Since 2008, the Department of Justice has been identifying deficiencies at the OCDC including: a. overcrowding; b. physical layout of the facility prohibiting adequate sight and sound supervision; c. an inordinately high risk of violence due to inability to properly supervise; and d. inadequate staffing numbers.

44. In 2012, the DOJ cited that the OCDC was still short-staffed and that detainee-on-detainee violence was still excessive due to overcrowding.

45. From at least 2008 to present, BOCC has failed to provide sufficient oversight and funding of Jail. Due to the documented dangers at the Jail, including DOJ's finding of inadequate supervision and staffing and a high rate of inmate assaults and deaths, in 2009, BOCC entered into a Memorandum of Understanding with the federal government. Under this Memorandum of Understanding, Oklahoma County was to adequately fund and staff the jail by 2014, or face court action from the federal government to force compliance.

46. As of January 2021, Oklahoma County had plainly not complied with the requirements of Memorandum of Understanding with the Department of Justice.

47. From at least 2008 to present, chronic shortage of detention officers and the facility's flawed design have made it impossible to adequately supervise the Jail.

48. Documented insufficient staffing levels and the poor condition of the 30+-year-old jail building have contributed to high death rates, numerous assaults and a lack of basic rights for inmates at the Jail over the past decade.

49. At the time of the incident involving Mr. Lane, the Jail employed fewer detention officers to supervise inmates, and other officers, than it did in 2008.

50. Due to the lack of adequate staffing, overcrowding and an attitude of indifference toward inmate safety, inmate-on-inmate assaults are commonplace at the Jail.

51. Indeed, in December of 2020, two inmates, Roy Lee Parkerson and Aaron Cooper, were violently assaulted by other inmates, in two separate incidents, while no detention officer provided any supervision or protection.

52. Four (4) other detention officers have been charged criminally for uses of excessive force on inmates who left their cells to shower or use the toilet without permission.

53. Three former detention officers face misdemeanor charges of cruelty for placing detainees in a "standing stress position," a well-known "enhanced interrogation" or torture tactic, and forcing them to listen to the children's song "Baby Shark".[2] The detention officers sometimes used the song as a form of discipline for inmates who left their cells.

54. Due to inadequate staffing, the "Baby Shark" victims were mostly left alone in their pods. One victim was singled out for punishment after he rigged the old, faulty lock in his cell so he could walk freely around the jail pod, shower and use a toilet with more privacy than the one in his shared living area.

55. As summarized in the Probable Cause Affidavits, the blatantly unconstitutional conduct of the "Baby Shark" officers, "Miles, Butler and Hendershott", was open, obvious and repeated. Yet, no one from Oklahoma County stepped in to take remedial action. This exemplifies a systemic and deep-seated failure to train and supervise,

---

[2]   Though these incidents occurred in 2019, when the Sheriff's Office operated the Jail, the Jail Trust is the successor entity for the purposes of municipal liability and BOCC has remained responsible for the Jail during all pertinent time periods.

with respect to the most basic aspects of correctional operations and constitutional conditions of confinement. As stated in the Probable Cause Affidavits:

> Upon interviewing DO Miles, he confirmed that he and Butler systematically worked together and used the benches, bars and attorney booth as a means to discipline inmates and teach them a lesson because they felt that disciplinary action within the Detention Center was not working in correcting the behavior of the inmates. Butler also confirmed that he used the booth as a means of punishment. Miles further stated that the inmates often "pissed off" Butler which evidence suggests led to those inmates being taken out of their cells/pods and mistreated. The secure point on the wall was measured as being 3ft from the floor up the wall. At this height and with no chair to sit on, it would have been nearly impossible for most inmates to sit or kneel thus forcing them to stand.
>
> Statements made by inmates and staff also indicated that in addition to the corporal punishment given by Miles and Butler, they additionally worked together and played children's music on a loop to play repetitively aloud while the inmates were housed in the attorney visitation booth thus putting undue emotional stress on the inmates who were most likely already suffering from physical stressors. The playing of the music was said to be a joke between Miles and Butler as confirmed by Miles.
>
> Additional evidence showed that Detention Officers Miles and Butler worked under their direct supervisor, Lt. Hendershott, who ***failed to properly supervise and discipline*** them. Miles and Butler were the subject of numerous inmate complaints that detailed their ***history of mistreatment of inmates*** ranging from retaliation to mishandling of inmate mail. In addition, nearly ***20 hand written inmate complaints*** were received at one time regarding one or both Officers and directly forwarded to their supervisor, Lt. Hendershott. Evidence suggests that no investigation was conducted and subsequently no corrective action was taken by their direct supervisor, Lt. Hendershott. Evidence also showed that when Hendershott first learned of inmate mistreatment by Miles and Butler on 11-23-19, he took no immediate action to either aid the inmate victim or discipline the Officers. ***This appeared to have led to the Officers continuing to mistreat inmates where at least an additional six (6) inmates were physically victimized.***

56. Another inmate, Charlton Chrisman, died in 2017 after he was shot at close range more than a dozen times with pepper balls by detention officers at the Jail. His family

11

filed a federal civil rights lawsuit. BOCC recently approved a $1.1 million settlement of that lawsuit.

57. The Jail Trust retained consultant David Parker to provide recommendations to remedy the continuing deficiencies at the Jail. Parker issued a report finding outdated training and policies and procedures, a staff consensus is that "every issue that transpires in the jail can be traced to staff shortages", and staff being trained to detect and/or intervene in inmate incidents appropriately.

58. In May 2021, the National Institute of Corrections provided a report to the BOCC and Jail Trust finding: a. an incomplete staffing plan; b. that new hires receive limited training; c. "[c]lear and convincing present level of staffing was insufficient for a safe and secure jail"; d. it was "[i]mpossible to effectively manage inmate population when they are so short-staffed;" e. that officers were coming to work without proper training; and f. a lack of policies and procedures posted.

59. In October of 2021, an inmate named Ta'Vion Murphy was subjected to an inmate-on-inmate assault when another detention officer, Dominique Thomas, allowed access an inmate access to Murphy for the purposes of permitting an assault of Murphy. Murphy was subsequently stabbed nearly 30 times.

60. Defendants BOCC and Jail Trust's deliberate indifference to the DOJ's reports, and other clear evidence, warning that short staffing and overcrowding continue to lead to detainee-on-detainee violence violates all detainees' rights to be free from harm and threat, in violation of the United States Constitution.

61. Numerous news and internet articles also made Defendants BOCC and Jail

Trust aware prior to December 2020 of the unreasonable conditions at the Jail. For example: "Over the past 15 years, the 13-story jail, in Oklahoma City has had many alleged problems, from unsanitary conditions to negligent car of inmates, poor medical care, and outright abuse of inmates. A clerical worker at the jail posted a YouTube video claiming inmates had been beaten right in front of her." (BUSINESS INSIDER, The stories coming out of this Oklahoma jail are horrifying, February 25, 2015).

62. Oklahoma County/OCCJA plainly failed to adequately train and supervise its officers, in violation of policies and the Oklahoma Jail Standards, including Officer Wood, with respect to, *inter alia*: protection of inmates, inmate-on-inmate assault, adequate medical care for injured inmates, cruel or inhumane corrections practices and constitutional requirements for the conditions of confinement.

63. In finding constitutional liability at the county level, the Tenth Circuit, in *Tafoya v. Salazar,* 516 F.3d 912, 919 (10th Cir. 2008), pointed to evidence of an "undisciplined culture of 'anything-goes' among the detention officers [that] remained unaddressed and unmitigated by Sheriff Salazar, who continued to employ a hands-off approach to jail management." Here, as discussed throughout, the County's/Jail Trust's "management style" has been "hands-off" at best and describing the culture at the Jail as "undisciplined" and "anything goes" would be charitable.

64. The County/BOCC/Jail Trust have had abundant opportunity to increase funding, supervision and training which would allow it to properly staff and address the systemic deficiencies that have plagued the Jail for well over 10 years. Its failure to do so has resulted in injury to multiple detainees, including Mr. Lane. Its failure to take

reasonable measures to alleviate known and substantial risks to inmates like Mr. Lane constitutes deliberate indifference at the municipal level.

## CAUSES OF ACTION

### VIOLATION OF THE EIGHTH AND/OR FOURTEETH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. § 1983)

65. Paragraphs 1-64 are incorporated herein by reference.

### A. Individual Liability and Underlying Violation of Constitutional Rights

- **Conditions of Confinement/Failure to Protect**

66. At the time of the complained events, Mr. Lane had a clearly established constitutional right under the adequate conditions of confinement.

67. The right to be protected against violence committed by other inmates is part of the conditions of confinement requirement afforded by the Constitution.

68. Any reasonable Jail employee knew or should have known those rights at the time of the complained of conduct as they were clearly established.

69. Officer Wood failed to protect Mr. Lane from harm by leaving the 13th floor of the Jail unsupervised for at least an hour, with knowledge that Lane was housed with a known violent offender.

70. In addition, the failure to provide any supervision of the 13th floor during the assault and after Mr. Lane repeatedly screamed for help constitutes deliberate indifference to Mr. Lane's health and safety.

71.     With deliberate indifference, Officer Wood failed to protect Mr. Lane from harm, and disregarded the known, obvious and excessive risks of harm to Mr. Lane.

72.     As a direct proximate result of Officer Wood's unlawful conduct, Mr. Lane suffered actual and severe physical injuries, physical pain and suffering and emotional and mental distress and death.

### B. Municipal Liability

73.     Paragraphs 1-72 are incorporated herein by reference.

74.     The aforementioned acts or omissions of Officer Wood are causally connected with customs, practices, and/or policies which Oklahoma County/OCCJA/BOCC promulgated, created, implemented and/or possessed responsibility for.

75.     To the extent that no single officer violated Mr. Lane's constitutional rights, Oklahoma County/OCCJA are still liable under a theory of a systemic failure of Oklahoma County/OCCJA policies and procedures as described below. There were such gross deficiencies in staffing, facilities and procedures that Mr. Lane was effectively denied constitutional conditions of confinement.

76.     Those customs, practices, and/or policies are outlined in Paragraphs 35-64, *supra*.

77.     Oklahoma County/OCCJA/BOCC knew, must have known or should have known that, by maintaining such customs, practices, and/or policies, detainees like Mr. Lane were at substantial risk of harm.  Nevertheless, Oklahoma County/OCCJA/BOCC failed to take reasonable measure to alleviate the risk of harm.

15

78. Oklahoma County/OCCJA/BOCC, through its failure to take reasonable remediable measures has been deliberately indifferent to citizens', including Mr. Lane's, health and safety.

79. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Lane suffered injuries and damages as alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant him the relief sought, including but not limited to actual and compensatory in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, punitive damages for Officer Wood's reckless disregard of Mr. Lane's federally protected rights, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
SMOLEN & ROYTMAN
701    Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

***Attorneys for Plaintiff***