AUSTIN BOND, as Personal Representative of )
The estate of BRAD LANE, Deceased. )
)
    *Plaintiff,* )
)
)
v. )    Case NO. CIV-23-05-D
)
(1) OKLAHOMA COUNTY CRIMINAL )
    JUSTICE AUTHORITY, )
(2) BOARD OF COUNTY COMMISSIONERS )
    FOR OKLAHOMA COUNTY, )
(3) MELISSA WOOD )
)
)
    *Defendants* )

# Expert Report of Jeffrey S. Carter

## Personal Background

1.    My name is Jeff Carter. I have been actively involved in corrections and jail practices since February 1999. I retired on December 1, 2018, as the Deputy Director of the Division of Community Corrections, otherwise known as the Fayette County Detention Center (FCDC) located in Lexington, KY. FCDC is a 1300-bed correctional facility, housing local, state, and federal inmates.

2.    My formal education includes a Bachelor of Science degree in Corrections and Juvenile Services received in 1996, from Eastern Kentucky University, located in Richmond, KY. While attending EKU, I completed a six (6) month case-manager

EXHIBIT 6

internship at the Federal Medical Center (FMC-Lex), a Federal Bureau of Prison facility located in Lexington, KY.

3.   I began my career as a correctional officer in 1999 at the Fayette County Detention Center, working in the Bureau of Custody before I was transferred to the Bureau of Training as an academy instructor.  Along with my training staff, I trained over 700 recruits and provided annual in-service training for approximately 270 sworn and unsworn staff for the Division.

4.   As an academy instructor, I was certified to teach in several areas relating to corrections including the following: Pressure Point Control Techniques (PPCT), CPR, HIV/Blood Borne Pathogens, Basic First Aid, OC Pepper Spray, firearms instructor (pistol and shotgun), Glock Pistol Armorer and Investigating Sexual Assaults in a Correctional Setting.

5.   Since 2003, I have presented trainings in the areas of Use of Force, Mental Health, and Suicide Prevention, Prison Rape Elimination Act (PREA), Internal Affairs and Officer Ethics, Direct Supervision for Jails, and Preventing In-Custody Deaths.  I have presented trainings to the Kentucky Jailers Association throughout the state as well as to the American Jail Association in Sacramento, CA. and Louisville, KY. conferences.

6.   In January 2005, I was appointed as director of Three Forks Regional Jail.  This was a 154-bed regional jail, housing inmates for Lee, Wolfe, and Owsley counties

EXHIBIT 6

in eastern Kentucky. I supervised 27 staff in the day-to-day facility operation, ensuring the proper care, custody, and control of the 200 (state/local) inmate population. I revised the Policy and Procedure Manual in compliance with federal and state law. I implemented a rank structure among staff, not only clarifying supervisory roles but also encouraging staff to reflect leadership qualities in their pursuit of advancement. I prepared a grant request which was successful to obtain a twenty (20) bed renovation for a residential drug treatment program for inmates.

7.     In June 2005, I returned to the Fayette County Detention Center as a custody sergeant where I was promoted to the rank of lieutenant in November 2005, and assumed the duties of the facility safety officer.

8.     After being promoted to captain in 2007, I commanded the Professional Standards Bureau at FCDC where, after completing a 24-hour advanced course in Interviewing and Interrogating from John E. Reid and Associates, and a 40-hour Police Internal Affairs course from the Institute of Police Technology and Management (IPTM), I was charged with commanding the Internal Affairs, Training, Facility Safety, and Gang Intelligence units within the division.

9.     As commander of the Internal Affairs Unit, I investigated or supervised over 200 investigations of staff as well as contractor misconduct.

10.     In 2012, I was asked to complete a security audit for the Franklin County Regional Jail in Frankfort, KY. As part of this review, I assisted in identifying areas in policy,

EXHIBIT 6

training, and operations that may be improved upon, bringing the agency within the legal mandates and generally accepted practices of jail operations.

11.    In 2013, I was invited as a guest instructor for a course titled "Internal Affairs in the Jail Setting" at Eastern Kentucky University.

12.    As a certified instructor for a course titled "Investigating Sexual Assaults in the Correctional Setting", I have trained over 800 sworn and unsworn staff in completing these investigations within their facilities nationwide.

13.    From 2007 through 2018 I was trained, received certification, and practiced as a deputy coroner in Breathitt County, Kentucky. I assisted or directed investigations of deaths occurring within the jurisdiction as required by law. I lead activities of staff investigators involved with performing postmortem exams and conducting pathological and toxicological analyses while investigating circumstances of deaths to determine cause and manner and determine responsibility for accidental, violent, or unexplained deaths. I also coordinated contracts for such services with outside physicians, medical laboratories, and law enforcement agencies.

14.    After being promoted to the rank of major in 2013, I oversaw vendors and contractors who provided services to the Division of Community Corrections such as medical, mental health, food service, inmate commissary, and capital projects related to the Division. My responsibilities were to ensure the services provided met the contractual and legal expectations in the performance of their obligations.

EXHIBIT 6

15.     In 2014, I transferred to the Custody and Master Control Bureau where I supervised over 200 staff who were responsible for the day-to-day supervision of the population of over 1300 inmates. I was responsible for the administrative management of personnel whose primary duties and responsibilities were the custody, care, and control of inmates housed at FCDC.   My responsibilities included managing personnel action and employee performance issues, establishing appropriate staffing levels, and developing, updating, and implementing policies and procedures.

16.     After two years as being custody bureau major, I assumed command of the Administration Bureau in August 2016, where I supervised staff who maintain and enhance the organization's human resources by planning, implementing, and evaluating employee relations and human resources policies, programs, and practices, and oversaw the recruiting of new staff for the agency.

17.     In November 2016, I was promoted to deputy director of the division.  I supervised the 377 sworn and non-sworn staff in the daily operations of the facility until my retirement on December 1, 2018.

18.     Since 2016, I have been a national jail consultant for the Legal & Liability Risk Management Institute (LLRMI) where I conduct expert witness consultation concerning corrections around the country as well as training on jail and corrections nationwide.

EXHIBIT 6

19.     Between 2016 through November 2020, I also presented jail/corrections training for Public Agency Training Council (PATC) on a national scale.

20.     I have graduated from the top leadership courses offered by the National Institute of Corrections located in Aurora, Colorado such as the Executive Leadership Program (8 months), Jail Administration Course (40-hours), and Correctional Leadership Development (70 hours).

21.     I became a Certified Jail Manager (CJM) through the American Jail Association (AJA) in April 2018 and am a life member of this professional organization.

22.     I have received the following materials for this case:

**1. Responses to Lane Discovery**

   a.     41-Staff Schedules -OCCJA  386 to 474.pdf

   b.     42-OCDC Policies and Procedures.pdf

   c.     43 Training Binder 1 2023.pdf

   d.     44-Complaints.pdf

   e.     45-TC.pdf

   f.     46-Organizational Chart (Detention) August 2020.pdf

   g.     47-Staff List 12-01-20.pdf

   h.     48-DO job Description.pdf

   i.     49-Job Descriptions May 2021.pdf

   j.     50-DO Job Description.pdf

   k.     51-Requests and Grievances.pdf

   l.     52-Requests_and_grievances.pdf

   m.     53- UoF Disciplinary 2020-2023.pdf

EXHIBIT 6

n.     54--Reports to ODH July 1, 2020 to August 4, 2023.pdf

o.     55-ODH Reports to OCDC.pdf

p.     56- Schematic Drawings.pdf

q.     57-Brown Inmate File.pdf

r.     _Production Log Index.pdf

**2. OCCJA Rule 26 Disclosures**

a.     0-OCCJA Index.pdf

b.     1-Report Lt. Andrew Reeves.pdf

c.     2-Report Lt. Yolanda Doroteo.pdf

d.     3-Report Lt. Jeana Chairess.pdf

e.     4-Lt. Jamie McGuckin.pdf

f.     5-Report Cpl. Melissa Wood.pdf

g.     6-Report Cpl. Daniel Groves.pdf

h.     7-Report Cpl. Troy Lake.pdf

i.     8-Report SDO Joshua Thayer.pdf

j.     9-Report SDO Christina Hailey.pdf

k.     10-Report SDO Dequan Watts.pdf

l.     11-Report SDO Emily Coumanis.pdf

m.     12-Report of DO Dallas Jones.pdf

n.     13-Report DO Tiffany Williamson.pdf

o.     14-Report Abraham Laguerre.pdf

p.     15-Report DO Zachary Borders.pdf

q.     16-Delgado Report Hospital.pdf

r.     17-DO Border's Report Hosptial.pdf

s.     18-13D Call log 1200-2000 Jan 2nd All Cells.pdf

EXHIBIT 6

t.      19-Cell Block Reconciliation 13D_Redacted.pdf

u.      20-Inmate Cody Shannon Info_Redacted.pdf

v.      21-Mac Mullings Statement.pdf

w.      22-Brad Lane Booking Information_Redacted.pdf

x.      23-Shaquille Brown Booking Information_Redacted.pdf

y.      24-Consent to Search Blood Statement Brown_Redacted.pdf

z.      25-Brad Lane Cell Assignment.pdf

aa.      25-Brad Lane Cell Assignment_Redacted.pdf

bb.      26-Shaquile Brown Cell Assignment_Redacted.pdf

cc.      27-Cell Assignment All.pdf

dd.      28-Log Book 13D.pdf

ee.      29b-Jose Hernandez Calls Translation.pdf

ff.      30-Medical Examiner Report.pdf

gg.      31-Photos from Hall.pdf

hh.      32-ME Photographs.pdf

ii.      33-Lane Medical 1-2-21.pdf

jj.      34-Lane Medical History.pdf

kk.      35-Staff Schedules 1.2.21.pdf

ll.      36-Okla DHS Detention Facility Report.pdf

mm.      39-IPOL 2020-2021 POL.pdf

nn.      40-IPOL 2020-2021 Law Enforcement Liability.pdf

oo.      Defendants Rule 26 Disclosures-Brad Lane.pdf

**29-Phone Calls**

   *i.13D All Cells All Calls  1804 to 2246*

***ii.****29a-Brown*

EXHIBIT 6

  *iii.29b-Hernandez*

  *iv.29c-Lane*

  **37-Jail Video**

  *v.13D 1-2-20 All Video.mp4*

  *vi.Brown Booking 12-4-20 0507hrs.mp4*

  *vii.Lane Booking 12-11-20 0318hrs.mp4*

*viii.Videos of Brown*

   **3. OSBI Materials**

    *a.  22-Brad Lane Booking Information.pdf*

    *b.  23-Shaquille Brown Booking Information.pdf*

    *c.  CorEMR - LANE BRAD L - #130807545 (03-16-1980) __ Full Patient History _ v5.5.0.pdf*

    *d.  Lane's Inmate file.pdf*

    ***e.  OSBI Investigation (Bond).pdf***

   **4. Brown, Shaquile**

    *a.  AS 2022-013.pdf*

    *b.  Brown Booking Sheet.pdf*

    *c.  Brown Medical Note.pdf*

    *d.  JF 2021-002 (1).pdf*

    *e.  JF 2021-002 (2) (1).pdf*

    *f.  JF 2021-002.pdf*

    *g.  JF 2022-039.pdf*

    *h.  SDO Hill report and Browns Note to Dr Bruce.pdf*

    *i.  Shaquille Brown Letter.pdf*

EXHIBIT 6

j.      *Staff Assault.pdf*

k.      *TurnKey Incident Report.pdf*

**l.      Inmate Folder**

i.*11172023124538 (1).pdf*

ii.*11172023124549.pdf*

iii.*11172023124550.pdf*

iv.*11172023124552.pdf*

v.*11172023124553.pdf*

vi.*11172023124554 (1).pdf*

vii.*11172023124555.pdf*

viii.*11172023124557.pdf*

ix.*11172023124559.pdf*

x.*11172023124600.pdf*

xi.*11172023124601.pdf*

xii.*11172023124602.pdf*

xiii.*11172023124604.pdf*

xiv.*11172023124605 (1).pdf*

xv.*11172023124607.pdf*

xvi.*11172023124608.pdf*

xvii.*11172023124610.pdf*

xviii.*11172023124612.pdf*

xix.*11172023124613.pdf*

xx.*11172023124616.pdf*

xxi.*11172023124618.pdf*

EXHIBIT 6

*xxii. 11172023124620.pdf*

*xxiii. 11172023124622.pdf*

*xxiv. Brown, Shaquile Images.pdf*

      **5. Logbook**

          *a.     DSCN2222.jpg*

          *b.     DSCN2223.jpg*

          *c.     DSCN2224.jpg*

          *d.     DSCN2225.jpg*

          *e.     DSCN2226.jpg*

          *f.     DSCN2227.jpg*

      **6. Phone Calls**

          **a.     13D All Cells All Calls  1804 to 2246**

    *i. calls_01-04-21_141721*

    *ii. 01_Johnson_405-885-6193_01-02-21_2246.mp3*

    *iii. 01_Johnson_405-885-6193_01-02-21_2246_auth.mp3*

    *iv. 02_Inman_832-922-0677_01-02-21_2237.mp3*

    *v. 02_Inman_832-922-0677_01-02-21_2237_auth.mp3*

    *vi. 03_Inmate_405-713-2029_01-02-21_2233.mp3*

    *vii. 04_Inmate_405-713-2029_01-02-21_2233.mp3*

    *viii. 05_Inmate_405-713-2029_01-02-21_2223.mp3*

    *ix. 06_Ary_580-319-2931_01-02-21_2209.mp3*

    *x. 07_Biggers_405-788-8303_01-02-21_2158.mp3*

    *xi. 07_Biggers_405-788-8303_01-02-21_2158_auth.mp3*

    *xii. 08_Johnson_405-885-6193_01-02-21_2128.mp3*

    *xiii. 08_Johnson_405-885-6193_01-02-21_2128_auth.mp3*

EXHIBIT 6

*xiv.09_Hernandez_405-885-1438_01-02-21_2111.mp3*

*xv.10_Inmate_405-713-2029_01-02-21_2059.mp3*

*xvi.11_Inmate_405-713-2029_01-02-21_2044.mp3*

*xvii.12_Nelson_405-534-3246_01-02-21_2036.mp3*

*xviii.12_Nelson_405-534-3246_01-02-21_2036_auth.mp3*

*xix.13_Krautlarger_405-863-8941_01-02-21_2027.mp3*

*xx.13_Krautlarger_405-863-8941_01-02-21_2027_auth.mp3*

*xxi.14_Ary_580-319-2931_01-02-21_2024.mp3*

*xxii.15_Johnson_405-885-6193_01-02-21_2017.mp3*

*xxiii.15_Johnson_405-885-6193_01-02-21_2017_auth.mp3*

*xxiv.16_Williams_404-246-9815_01-02-21_1959.mp3*

*xxv.16_Williams_404-246-9815_01-02-21_1959_auth.mp3*

*xxvi.17_Inmate_405-713-2029_01-02-21_1945.mp3*

*xxvii.18_Krautlarger_405-517-8047_01-02-21_1940.mp3*

*xxviii.18_Krautlarger_405-517-8047_01-02-21_1940_auth.mp3*

*xxix.19_Littleton_602-367-2020_01-02-21_1928.mp3*

*xxx.19_Littleton_602-367-2020_01-02-21_1928_auth.mp3*

*xxxi.20_Inmate_405-713-2029_01-02-21_1928.mp3*

*xxxii.21_Colbert_405-923-5693_01-02-21_1924.mp3*

*xxxiii.22_Hernandez_405-317-7410_01-02-21_1922.mp3*

*xxxiv.22_Hernandez_405-317-7410_01-02-21_1922_auth.mp3*

*xxxv.23_Bjorlie_405-438-5800_01-02-21_1920.mp3*

*xxxvi.23_Bjorlie_405-438-5800_01-02-21_1920_auth.mp3*

*xxxvii.24_Inman_832-922-0677_01-02-21_1913.mp3*

*xxxviii.24_Inman_832-922-0677_01-02-21_1913_auth.mp3*

EXHIBIT 6

xxxix.25_Colbert_405-923-5693_01-02-21_1907.mp3

xl.26_Colbert_405-902-6972_01-02-21_1900.mp3

xli.26_Colbert_405-902-6972_01-02-21_1900_auth.mp3

xlii.27_Hernandez_405-317-7410_01-02-21_1856.mp3

xliii.27_Hernandez_405-317-7410_01-02-21_1856_auth.mp3

xliv.28_Inmate_405-713-2029_01-02-21_1855.mp3

xlv.29_Johnson_405-885-6193_01-02-21_1853.mp3

xlvi.29_Johnson_405-885-6193_01-02-21_1853_auth.mp3

xlvii.30_Inmate_405-713-2029_01-02-21_1852.mp3

xlviii.31_Inmate_405-713-2029_01-02-21_1850.mp3

xlix.32_Inmate_405-713-2029_01-02-21_1849.mp3

l.33_Colbert_405-923-5693_01-02-21_1848.mp3

li.34_Inmate_405-713-2029_01-02-21_1847.mp3

lii.35_Hernandez_405-317-7410_01-02-21_1845.mp3

liii.35_Hernandez_405-317-7410_01-02-21_1845_auth.mp3

liv.36_Hernandez_405-317-7410_01-02-21_1839.mp3

lv.36_Hernandez_405-317-7410_01-02-21_1839_auth.mp3

lvi.37_Bjorlie_405-438-5800_01-02-21_1819.mp3

lvii.37_Bjorlie_405-438-5800_01-02-21_1819_auth.mp3

lviii.38_Littleton_602-367-2020_01-02-21_1819.mp3

lix.38_Littleton_602-367-2020_01-02-21_1819_auth.mp3

lx.39_Inmate_405-713-2029_01-02-21_1810.mp3

lxi.40_Johnson_405-885-6193_01-02-21_1808.mp3

lxii.40_Johnson_405-885-6193_01-02-21_1808_auth.mp3

lxiii.41_Inmate_405-713-2029_01-02-21_1808.mp3

EXHIBIT 6

*lxiv.42_Inmate_405-713-2029_01-02-21_1805.mp3*

*lxv.43_Inmate_405-713-2029_01-02-21_1804.mp3*

*lxvi.file_list21439091.pdf*

*lxvii._21439091_calls_01-04-21_14172120210104-1804-td90up.txt*

    *b.   **Brown***

  *i.calls_01-04-21_113640 (1)*

  *ii.01_Brown_405-885-1438_01-02-21_1455.mp3*

  *iii.02_Brown_405-885-1438_01-02-21_1024.mp3*

  *iv.03_Brown_405-837-5535_01-02-21_0553.mp3*

  *v.04_Brown_405-863-2901_01-02-21_0016.mp3*

  *vi.05_Brown_405-837-5535_01-02-21_0006.mp3*

  *vii.06_Brown_405-410-4769_01-01-21_2345.mp3*

  *viii.07_Brown_405-837-5535_01-01-21_2312.mp3*

  *ix.08_Brown_405-837-5535_01-01-21_2250.mp3*

  *x.09_Brown_405-863-2901_01-01-21_1940.mp3*

  *xi.10_Brown_405-863-8950_01-01-21_1902.mp3*

  *xii.11_Brown_405-423-1882_01-01-21_1501.mp3*

  *xiii.12_Brown_405-837-5535_01-01-21_1440.mp3*

  *xiv.13_Brown_405-837-5535_01-01-21_1434.mp3*

  *xv.14_Brown_405-837-5535_12-31-20_2252.mp3*

  *xvi.15_Brown_405-837-5535_12-31-20_2245.mp3*

  *xvii.16_Brown_405-423-1882_12-31-20_2240.mp3*

  *xviii.17_Brown_405-837-5535_12-31-20_2235.mp3*

  *xix.18_Brown_405-863-8950_12-28-20_0713.mp3*

  *xx.19_Brown_405-837-5535_12-23-20_1259.mp3*

EXHIBIT 6

*xxi.20_Brown_405-898-4398_12-18-20_1822.mp3*

*xxii.21_Brown_405-837-5535_12-18-20_1758.mp3*

*xxiii.22_Brown_405-837-5535_12-18-20_1715.mp3*

*xxiv.23_Brown_405-837-5535_12-18-20_1705.mp3*

*xxv.24_Brown_405-837-5535_12-18-20_1702.mp3*

*xxvi.25_Brown_405-837-5535_12-18-20_1643.mp3*

*xxvii.26_Brown_405-837-5535_12-16-20_2049.mp3*

*xxviii.27_Brown_405-837-5535_12-16-20_1917.mp3*

*xxix.28_Brown_405-837-5535_12-13-20_2318.mp3*

*xxx.29_Brown_405-837-5535_12-13-20_2226.mp3*

*xxxi.30_Brown_405-837-5535_12-13-20_2016.mp3*

*xxxii.31_Brown_405-837-5535_12-13-20_2005.mp3*

*xxxiii.32_Brown_405-837-5535_12-13-20_2000.mp3*

*xxxiv.33_Brown_405-837-5535_12-13-20_1957.mp3*

*xxxv.34_Brown_405-837-5535_12-12-20_1815.mp3*

*xxxvi.35_Brown_405-837-5535_12-12-20_1355.mp3*

*xxxvii.36_Brown_405-837-5535_12-12-20_1239.mp3*

*xxxviii.37_Brown_405-837-5535_12-12-20_1141.mp3*

*xxxix.38_Brown_405-837-5535_12-12-20_1046.mp3*

*xl.39_Brown_405-898-4398_12-12-20_1020.mp3*

*xli.40_Brown_405-837-5535_12-12-20_1012.mp3*

*xlii.41_Brown_405-837-5535_12-11-20_1926.mp3*

*xliii.42_Brown_405-837-5535_12-10-20_1832.mp3*

*xliv.43_Brown_405-837-5535_12-09-20_1934.mp3*

*xlv.44_Brown_405-837-5535_12-09-20_1917.mp3*

EXHIBIT 6

*xlvi.45_Brown_405-898-4398_12-09-20_1756.mp3*

*xlvii.46_Brown_405-423-1882_12-09-20_1750.mp3*

*xlviii.47_Brown_405-837-5535_12-09-20_1122.mp3*

*xlix.48_Brown_405-837-5535_12-07-20_1931.mp3*

*l.49_Brown_405-837-5535_12-06-20_1127.mp3*

*li.50_Brown_405-837-5535_12-05-20_1850.mp3*

*lii.51_Brown_405-423-1882_12-05-20_1801.mp3*

*liii.file_list21439091.pdf*

*liv._21439091_calls_01-04-21_11364020210104-1804-almkn1.txt*

### c. *Hernandez*

*i.calls_01-04-21_140259*

*ii.01_Hernandez_405-317-7410_01-03-21_1750.mp3*

*iii.01_Hernandez_405-317-7410_01-03-21_1750_auth.mp3*

*iv.02_Hernandez_405-900-2981_01-03-21_1429.mp3*

*v.02_Hernandez_405-900-2981_01-03-21_1429_auth.mp3*

*vi.03_Hernandez_405-317-7410_01-03-21_1134.mp3*

*vii.03_Hernandez_405-317-7410_01-03-21_1134_auth.mp3*

*viii.04_Hernandez_405-317-7410_01-03-21_1111.mp3*

*ix.04_Hernandez_405-317-7410_01-03-21_1111_auth.mp3*

*x.05_Hernandez_405-317-7410_01-03-21_1058.mp3*

*xi.05_Hernandez_405-317-7410_01-03-21_1058_auth.mp3*

*xii.06_Hernandez_405-317-7410_01-02-21_2304.mp3*

*xiii.06_Hernandez_405-317-7410_01-02-21_2304_auth.mp3*

*xiv.07_Hernandez_405-885-1438_01-02-21_2300.mp3*

*xv.08_Hernandez_405-885-1438_01-02-21_2111.mp3*

EXHIBIT 6

xvi.09_Hernandez_405-317-7410_01-02-21_1922.mp3

xvii.09_Hernandez_405-317-7410_01-02-21_1922_auth.mp3

xviii.10_Hernandez_405-317-7410_01-02-21_1856.mp3

xix.10_Hernandez_405-317-7410_01-02-21_1856_auth.mp3

xx.11_Hernandez_405-317-7410_01-02-21_1845.mp3

xxi.11_Hernandez_405-317-7410_01-02-21_1845_auth.mp3

xxii.12_Hernandez_405-317-7410_01-02-21_1839.mp3

xxiii.12_Hernandez_405-317-7410_01-02-21_1839_auth.mp3

xxiv.file_list21439091.pdf

xxv._21439091_calls_01-04-21_14025920210104-1804-160spde.txt

### d. Hernandez Calls Translated

i.calls_01-03-21_043506

ii.01_Hernandez_405-317-7410_01-02-21_2304.mp3

iii.01_Hernandez_405-317-7410_01-02-21_2304_auth.mp3

iv.02_Hernandez_405-885-1438_01-02-21_2300.mp3

v.03_Hernandez_405-885-1438_01-02-21_2111.mp3

vi.04_Hernandez_405-317-7410_01-02-21_1922.mp3

vii.04_Hernandez_405-317-7410_01-02-21_1922_auth.mp3

viii.05_Hernandez_405-317-7410_01-02-21_1856.mp3

ix.05_Hernandez_405-317-7410_01-02-21_1856_auth.mp3

x.06_Hernandez_405-317-7410_01-02-21_1845.mp3

xi.06_Hernandez_405-317-7410_01-02-21_1845_auth.mp3

xii.07_Hernandez_405-317-7410_01-02-21_1839.mp3

xiii.07_Hernandez_405-317-7410_01-02-21_1839_auth.mp3

xiv.file_list21439091.pdf

EXHIBIT 6

*xv._21439091_calls_01-03-21_04350620210103-1804-12g5chi.txt*

*xvi.Jose Hernandez Calls Translation.pdf*

> ***e. Lane***

> *i.calls_01-04-21_120049*

> *ii.01_Lane_405-885-1438_01-02-21_1959.mp3*

> *iii.02_Lane_405-885-1438_01-02-21_1745.mp3*

> *iv.03_Lane_405-885-1438_01-02-21_1704.mp3*

> *v.04_Lane_405-885-1438_01-02-21_1618.mp3*

> *vi.05_Lane_405-885-1438_01-02-21_1519.mp3*

> *vii.06_Lane_405-885-1438_01-02-21_1019.mp3*

> *viii.07_Lane_405-885-1438_01-02-21_1014.mp3*

> *ix.08_Lane_405-885-1438_01-02-21_0956.mp3*

> *x.09_Lane_405-885-1438_01-02-21_0926.mp3*

> *xi.file_list21439091.pdf*

> *xii._21439091_calls_01-04-21_12004920210104-1804-1v7js93.txt*

> *7. OCDC Annual Report.pdf*

> *8. 2021-01-xx Six Month Update - OCDC (S561597xAEC9B).pdf*

> *9. Lane's Inmate file.pdf*

> *10.25-Brad Lane Cell Assignment.pdf*

> *11.26-Shaquile Brown Cell Assignment_Redacted.pdf*

> *12. OCDC Classification Information provided by Captain McGuckin*

23.    This expert report is based on the materials provided to date. The opinions presented in this report are based upon my specialized experience, training, and

EXHIBIT 6

knowledge of corrections practices as well as my continued research and work with law enforcement nationally.

24.     My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, corrections activity, and corrections administration and supervision.

25.     I am familiar with civil litigation and know the normal phases of discovery. I recognize that there may be additional documentation as the case progresses. In the event additional material is produced, I shall be prepared to supplement this report.

26.     At the outset, it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based on credibility issues of the parties.

27.     As it relates to the safety, welfare, and supervision of inmates, I am familiar with generally accepted policies, practices, training, and industry standards, as well as state and national standards concerning security staff's duty to protect inmates in their care, and to provide inmates access to adequate medical care. I am also familiar with generally accepted policies, practices, training, and industry standards related to correctional staffing patterns and the importance of ensuring posts designated as "critical" for the safety and security of the facility are filled.

28.     As a member of the American Correctional Association (ACA), I am familiar with ACA standards and may reference these standards within my report.

EXHIBIT 6

29.    Although jail/prison administrators have no "mandated" national standards to follow, there are two (2) resources many turn to in order to obtain "best practices" relating to standards when creating policy and practice. These are:

- American Correctional Association's (ACA), Standards, and

- National Commission on Correctional Health Care (NCCHC),

30.    While the ACA and NCCHC standards attempt to reflect the "ideal" practices for jails/prison administrators, they do not necessarily constitute mandatory or required correctional practice for all facilities. Many corrections experts like to refer to these standards as if they are mandatory, but this approach is misleading and inaccurate.

31.    The ACA and NCCHC standards only apply to agencies that choose to be accredited by those organizations and pay the fees associated with obtaining and having the accreditation. Therefore, the constitutionally accepted minimum practice and standard of conduct in correctional facilities is not determined by these "recommended" standards.

32.    I will be referencing the Oklahoma Administrative Code (OAC)/Title 310/Chapter 670-Jail Standards in this report.

33.    The OAC/Title 310/Chapter 670-Jail Standards (OACs) are considered the minimum jail standards for the state. The OAC standards referenced in this case were implemented on September 13, 2019, and were in effect January 2021.

EXHIBIT 6

34.   I will also be referencing the OCDC policies in effect on January 2, 2019, as they apply in this matter.

35.   The action(s) I have been retained to review occurred on or about January 2, 2021, at the Oklahoma County Detention Center (OCDC) located at 201 N Shartel Ave, Oklahoma City, OK 73102.

## General Case Background

36.   On January 2, 2021, Corporal Melissa Wood (Cpl. Wood) began her shift at 1800 and was assigned to floor 13 David at the OCDC.  Her shift began by waiting in the medical area of the jail in order to escort inmate Eddie Hollins (Mr. Hollins) back to her assigned floor after his medical visit.  Due to the time Mr. Hollins was kept in the medical area, Cpl. Wood missed observations in 13D from 1800 till 1902, which were to be completed every half hour.

37.   Upon arriving at 13D, Cpl. Wood completed a site check of the unit prior to placing Mr. Hollins back in his cell.  Upon arriving at cell #11, the cell Mr. Brad Lane (Mr. Lane) and Mr. Shaquile Brown (Mr. Brown), were being housed in, and observed Mr. Brown standing on his bunk holding a piece of metal and not responding to her questions.  Cpl. Wood observed "lots" of blood inside the cell and Mr. Brown's cellmate, Mr. Lane, lying on the floor under a mat and not responding to questions as well.

EXHIBIT 6

38.     Cpl. Wood sounded the alarm for medical to respond and all available staff to assist with the situation.  Mr. Brown continued to act strangely and refused to drop the weapon he held in his hand defying directives by staff to get on the ground or go to the back of the cell.

39.     Ultimately, Mr. Brown was sprayed with oleoresin capsicum (pepper spray) and was subsequently secured in restraints and removed from the cell.  This allowed staff, including medical staff, to enter and assess the condition of Mr. Lane.

40.     Mr. Lane was removed from the cell, placed on a gurney, and escorted to medical for further assessment where it was determined Mr. Lane was deceased.

## **Booking**

41.     It is industry standard for all inmates to be triaged during the booking process where a questionnaire is completed that contains questions relating to the person's current medical and mental health status.

42.     This is a critical step in a person's incarceration that assists staff in determining any acute medical or mental health issues that the person may be experiencing at the time and ensures those issues are addressed.

43.     The triage questionnaire routinely consists of not only questions that are asked of the transporting officer and subject being brought in, but also requires observations be made by the booking officer relating to any observable issues relating to medical and mental health.  It is imperative that the questions be answered truthfully, with

EXHIBIT 6

full disclosure, which will enable staff to provide the proper care, custody and control of the subject being brought into the facility.

44.    The information obtained during the booking process is used to determine the person's custody level, housing assignment, and other needs, such as medical/mental health.

45.    OAC 310:670-5-1. Admission, Release and Records states:

*The following admission and release procedures shall be followed. A facility shall have written policies and procedures for the reception, orientation and release of inmates.*
*(1) The admission process of new inmates shall include at least the following:*
    *(A) Verification of arrest or commitment papers;*
    *(B) A search of the individual upon entering the facility and a complete bodily search of the individual may be authorized prior to entering the general population;*
    *(C) Intake screening by trained facility personnel utilizing, in part, a medical/mental health questionnaire approved by the Department of Health, or a screening conducted by a physician or other licensed medical personnel;*
    *(D) Procedures to ensure orientation and understanding of facility rules;*
    *(E) Issue bedding, clothing, and footwear; and*
    *(F) Classification and assignment to a housing unit.*

46.    OCDC policy 4020.04- Inmate Reception and Orientation is a comprehensive document that provides clearly the agency expectations relating to the protocols to follow when booking an arrestee into the OCDC.

47.    I found policy 4020.04 to describe:

- *How to determine the legal confinement of the arrestee.*
- *The Acceptance Process that entails nine stations the person is taken through which include:*

EXHIBIT 6

1. *Station #1 - Weapons Search where the person has a clothed body search conducted looking for contraband.*
2. *Station #2 – Initial Medical Screening where vitals are taken, and suicide evaluation conducted.*
3. *Station #3 - Morpho- Touch where the person is fingerprinted.*
4. *Station #4 – OCPD Only where arrestees arrested by the Oklahoma City Police Department who have additional booking procedures.*
5. *Station #5 – OR/CBR where the individual is assessed for potential release.*
6. *Station #6 – Immigration Customs Enforcement (ICE) where immigration issues are determined.*
7. *Station #7 – Processing where photos are taken, scars, marks and tattoos are documented, and other biographical information is collected.*
8. *Station #8 – Medical and Mental Health Screening where all arrestees are screened to determine any acute medical/mental health issues they may be experiencing, and determine if the person will be accepted into the jail.*
9. *Station #9 – Booking where the person is placed in a holding cell where it is determined if the person has any holds from other agencies and bond information obtained.*

- *The additional processes juvenile inmates are put through when brought in for booking.*
- *How to properly manage combative/Uncooperative arrestees.*
- *The proper Change Out protocols where the arrestee's clothing is changed where they wear OCDC uniforms.*
- *An orientation is conducted where the arrestee is given an OCDC inmate handbook where rules are explained, Prison Rape Elimination Act (PREA) information is provided and covers other logistical procedures.*

48.  I find OCDC policy 4020.04 to be a thorough policy that clearly describes the booking protocols for all persons being booked into the OCDC.  I find the policy satisfies Oklahoma Jail Standards and meets industry standards in corrections.

49.   According to the OCDC booking documents, Mr. Brown was booked into the OCDC on December 4, 2020, at approximately 2120 and charged with:

EXHIBIT 6

- *Two counts- Possession of controlled dangerous substance (Misdemeanor)*
- *Two counts- Aggravated assault and battery (Felony)*
- *Two counts- Attempted robbery in the first degree*
- *Gang association*
- *Two counts- Robbery in the second degree*

50.   Based on Mr. Brown's medical triage, it was determined he would be assigned to the medical housing unit at OCDC due to having a tracheotomy in his neck and needing frequent medical care.

51.   According to the report completed by Sgt. Gavin Holloway (Sgt. Holloway), he was advised at approximately 2159 that Mr. Brown was to be placed on "MED" status and was then relocated to the medical unit 13D and housed in cell #7 for medical observations.

52.   According to OCDC booking documents, Mr. Lane was booked into the OCDC on December 11, 2020, and charged with:

- *Driving while privilege suspended/revoked/cancelled/denied*
- *Reckless driving*
- *Obstructing an officer*
- *Possession of a stolen vehicle*
- *Driving while privilege suspended*
- *Possession of drug paraphernalia*
- *Possession of a controlled dangerous substance (Misdemeanor)*
- *Unauthorized use of a vehicle.*

53.   Case material shows upon being processed through booking procedures it was determined Mr. Lane had had surgery on his left ankle in October 2020, and was wearing a boot brace.  Based on Mr. Lane's booking triage, he was placed on medical

EXHIBIT 6

observation and relocated to medical housing 13D on December 11, 2020, at approximately 0858 and placed in cell #17.

## **Cell #17**

54.    Case material reflects Mr. Lane was placed in cell #17 at approximately 0858 on December 11, 2020, and Mr. Brown was relocated into cell #17 at approximately 0830 the following day- December 12, 2020.   Although there are very little documentation in the case material that references it, another inmate, Mr. David Raney, was also in cell #17 with Mr. Lane and Mr. Brown for a short period of time but not on January 2, 2020. (*Oklahoma County Cell Block Reconciliation*).

55.    I found Mr. Brown was relocated from cell 13D #7 to 13D cell #17 on December 12, 2020, at approximately 0830, by Cpl. Ledford to reduce the "triple celling" of inmates (OCCJA3658).  Triple celling is where three inmates are housed inside a cell that is designed for either one or two people.

56.    Based on case material, Mr. Lane and Mr. Brown were housed in the medical unit 13D in cell #17 together beginning December 12, 2020, at approximately 0830 until January 1, 2021, (Approximately 20 days).

57.    An interview was completed on January 2, 2021, by Investigator David Gatlin of the Oklahoma State Bureau of Investigations (OSBI) of Lt. Andrew Reeves (Lt. Reeves).  Lt. Reeves stated in the interview that on January 1, 2021, one day prior to Mr. Brown assaulting Mr. Lane in cell #11,  Mr. Brown and Mr. Lane complained

EXHIBIT 6

that their cell was "flooding" from the commode.  Mr. Lane requested to move to another cell since he was sleeping on a mat on the floor and Lt. Reeves and Lt. Jamie McGuckin (Lt. McGuckin) agreed to allow him to move, and he was going to be placed in cell #11.

58.   Lt. Reeves went on to say in the interview that Mr. Lane also requested that Mr. Brown be allowed to move to cell #11 with him due to his tracheotomy tube stating, "*the phone would work better for Brown in cell #11*."  Mr. Brown was allowed to move into cell #11 with Mr. Lane.

59.   No facts exist that Mr. Lane and Mr. Brown had any disagreements or altercations during the time they shared a cell from December 12, 2020, till the assault on January 2, 2021.  Multiple interviews were conducted by OSBI with OCDC staff who interacted with Mr. Lane and Mr. Brown during the time they were sharing a cell, and inmates who were housed in medical housing 13D who interacted with both Mr. Brown and Mr. Lane, all were consistent in the opinion that Mr. Lane and Mr. Brown were cordial toward each other, and no one recalled any disagreements or issues between the two.

## **Classification**

60.   The Plaintiff has opined that Mr. Lane and Mr. Brown should not have been classified where they would have been in the same cell with each other.  Based on the case material, I found both Mr. Lane and Mr. Brown were classified as medium

EXHIBIT 6

custody inmates, and both were also placed in the medical unit due to having medical issues that potentially needed more frequent care.

61.     Jails use a classification system to assess an inmate's risk and needs, and based on those risk and needs, assist in determining the person's housing and programming. The process of jail classification varies from jurisdiction to jurisdiction, depending on such factors as the characteristics of the inmate population and the physical plant design of the facility.  A jail classification system is a fluid process and should be tweaked at times, depending on the needs of the facility and inmate population.

62.     An Objective Jail Classification (OJC) is a method of categorizing inmates based on standardized screening and assessment instruments or forms, rather than relying solely on the subjective judgment of staff members.  This approach aims to minimize biases and inconsistencies in classification decisions by utilizing a standardized evaluation process.

63.     In an OJC system, inmates are evaluated using predefined criteria that consider factors such as criminal history, current charges, medical/mental health status, behavior patterns, and other relevant information. The completion of these assessment instruments generates recommendations for custody designation, housing placement, and program needs.

64.     A jail classification system can generally be categorized as either subjective or objective. Subjective systems rely on the discretion and judgment of experienced

EXHIBIT 6

staff members assigning an inmate's classification. These systems are based on the assumption that staff members possess the knowledge and expertise to make informed decisions about an inmate's classification. However, subjective classification systems can lead to inconsistencies and biases among staff members, due to all staff members not having equal experience or decision-making abilities, relating to classification.

65.    On the other hand, objective systems use standardized screening and assessment instruments or forms to gather information about the inmates that ensure uniformity and consistency.

66.    The role of staff expertise and judgment in an OJC system is limited to either agreeing or disagreeing with the recommendations created by the instrument. The OJC systems goal is to minimize subjectivity and increase the consistency and reliability of classification decisions. They ensure that all inmates are evaluated using the same criteria, reducing the potential for biases and inconsistencies among staff members, but also contain an element of an "override" in the initial classification.

67.    It is important to note that staff expertise and judgment still play a small role in the objective system. Staff members review and validate the recommendations generated by the assessment instruments, offering their agreement or disagreement based on their knowledge and experience. While staff input is a component of the

EXHIBIT 6

process, the primary focus of an OJC system is on the standardized assessment of inmates to determine their custody and program needs.

68.     The OJC system is the current industry standard for making jails a safer environment for inmates as well as staff around the country.

69.     OAC 310:670-5-5. Classification and Segregation states (In Part):

*The facility administrator shall develop and implement written policies and procedures for the classification and segregation of inmates. The classification plan shall ensure the safety of inmates and staff. The following criteria shall ensure an adequate classification and reclassification system.*

*(3) Inmates considered to be a threat to other inmates or staff shall be housed separately from other inmates for the following reasons:*
*(i) Inmate's past criminal history;*
*(ii) The nature and severity of the charges pending against the inmate;*
*(iii) Inmate's behavior while in the facility; and*
*(iv) Other relevant reasons as directed by the administrator.*
*(4) Inmates may be double-celled or confined to dormitory style housing if the floor space meets the square footage requirements. These inmates shall be afforded the same living conditions and privileges as those occupying the general population. Any exception regarding conditions and privileges shall be defined by the administrator.*
*(6) Inmates who appear to have a significant medical or psychiatric problem may be separated from other inmates.*

70.     Although the Oklahoma Jail Standards requires jails to implement a classification system, they leave the option open relating to whether it's an objective or subjective system.  Based on case material the OCDC utilizes an OJC system to classify their inmate population.

EXHIBIT 6

71.     OCDC policy 4105.04 Inmate Classification Program provides the detailed process

for the classification protocol for all inmates booked into the OCDC.  The policy

defines their OJC as:

Definition
*Objective Jail Classification System (OJCS) -A computer-based system that records
and tracks inmate data and uses the data to objectively assign inmates to specific
custody levels.*

72.     The policy also provides the following classification standards:

*The Oklahoma County Detention Center will classify inmates using a comprehensive
and uniform objective classification system. This system will be based on facility
security, inmate programs, inmate supervision needs, and appropriate housing
assignments.*
- *To the extent possible, only documented information will be used in
  classification decision-making and the reasons for those decisions will be
  recorded.*
- *Juvenile records will remain confidential consistent with state statutes and
  applicable policies.*
- *Information concerning an inmate's juvenile offenses will be used for
  classification purposes only.*
- *All inmates will be assessed and classified at the time of their intake.*

73.     OCDC classification policy describes the responsibilities for classification officers

when applying the OJC system for the inmate population including the initial

custody assessment process, the scoring system used to determine an inmate's

custody level, and how overrides play an important part when utilizing an OJC

system.

74.     The policy also provides guidance on when a reclassification shall be completed,

when an inmate's situation changes, managing the records relating to an inmate's

EXHIBIT 6

classification and the review and level of authority needed for discretionary overrides.

75.    I find the OCDC policy 4105.04 Inmate Classification to satisfy the Oklahoma Jail Standards and meets generally accepted practices in jails relating to the classification of jail inmates.

76.    According to  OCDC Classification Information received in the case material from Captain Jamie McGuckin (Capt. McGuckin) on May 14, 2024, Capt. McGuckin stated Mr. Brown's original classification outside being on medical was maximum security and this was due to having assault and drug charges.

77.    Mr. Lane's original classification was medium security medical due to drug charges, possession of stolen property and having a hold from another county.  Capt. McGuckin also stated "*According to our policy, Medium and Maximum can be housed together, Medium and Minimum can be housed together, but Minimum and Maximum cannot be housed together. Medical always has 2 per cell.*"

78.    Based on my training and experience, OCDC policy to allow medium security inmates to be housed with maximum security inmates meets industry standards relating to an OJC systems.   If the facility plant design allows for segregating maximum and medium security inmates, it is generally done, however, there can be instances where maximum and medium inmates are housed together for temporary situations such as transports and medical treatment.

EXHIBIT 6

# Cell #11

79.      Mr. Lane and Mr. Brown were housed inside medical housing 13D on January 2, 2021. The logs show there were multiple staff observations conducted in 13D on January 2 and no one reported any issues between Mr. Brown and Mr. Lane.

80.      Case material shows Mr. Brown was pulled out of his cell on January 2, 2021, and escorted to the medical clinic where Nurse David Muniz, LPN (Nurse Muniz) assisted in cleaning Mr. Brown's tracheotomy tube. Nurse Muniz stated in his OSBI interview that during his interactions with Mr. Brown he was polite and never aggressive.

81.      The logs show at 1642 Detention Officer Carol Richmond (Ofc. Richmond) completed serving evening meal, with assistance of inmate workers and she stated in her OSBI interview that both Mr. Brown and Mr. Lane took their trays and both Brown and Lane were "fine" when she left the unit.

82.      Prior to picking up food trays, the log reflects Ofc. Richmond completed a site check at 1657 and 1722 without reporting any issues within the unit. At 1735, Ofc. Richmond documented in the logbook she had completed her last site check prior to ending her shift at 1800, and according to her OSBI interview, this was when she collected food trays.

83.      The log shows at 1740 Mr. Hugo Gomez was relocated from 10A cell #13 to 13D #19 by "Morales", but a site check was not documented.

EXHIBIT 6

84.     OCDC phone records reflect Mr. Lane made a phone call initiated at 1745 which lasted for 4 minutes and 58 seconds. During this call Mr. Lane talks to a male and female and discusses financial issues. He does not give any indication that he and Mr. Brown are having any issues inside the cell, or that he has been in any disagreements or altercations. The evidence shows the call ended at approximately 1750.

85.     Case material shows Ofc. Richmond was relieved by Detention Officer Melissa Wood (Ofc. Wood) at 1800 and upon beginning her shift, inmate Eddie Hollins (Mr. Hollins) was in medical and would be going back to 13D after being seen by medical. Per OCDC policy, site checks in 13D were to be completed every 30-minutes therefore it is plausible that another site check should have been completed at 1805 and 1835. Due to Mr. Hollins being kept in the medical for an extended period of time, Ofc. Wood missed the 1805 and 1835 site check in 13D.

86.     Unit video recording (*13th Floor David Pod 4 Small Side (TR-090662)*) shows inmate Jose Hernandez (Mr. Hernandez) came out of his cell (#5) at approximately 1820 and stated in his OSBI interview he heard yelling coming from cell #11. At 1821 Mr. Hernandez first looks into cell #11

87.     Unit video recording (*13th Floor David Pod 1 Large Side 2 (B205-00485)*) reflects Ofc. Wood and Mr. Hollins arrived back in 13D at 1902 and before securing Mr. Hollins back in his cell, Ofc. Wood began a site check in each cell in 13D.

EXHIBIT 6

## **Assault Response**

88.    According to unit video recording (*13th Floor David Pod1 Large Side 2 (B205-00459)*), Ofc. Wood arrived at cell #11, where Mr. Lane and Mr. Brown were being housed, at 1904.  She stated she observed Mr. Brown standing on his bunk with his pants off with what appeared to be holding a distorted metal object in his hand.  Ofc. Wood attempted to communicate with Mr. Brown, but he was not responding to her questions.

89.    Ofc. Wood observed blood around the cell and saw Mr. Lane being covered up by a mat lying on the floor.  Ofc. Wood stated she then called for medical staff and assistance from other custody staff.  Upon arrival, Lt. Reeves assessed the situation and gave Mr. Brown directives to "*turn around*", "*get on the ground*", and "*go to the back of the cell*" without compliance, according to his OSBI interview.

90.    Lt. Reeves, seeing that Mr. Brown was not complying with his directives, made the decision to make a tactical entry where the door was opened, and pepper spray was deployed to Mr. Brown in order for staff to gain control.  Staff, seeing the pepper spray was not having the desired effect, entered the cell and physically secured Mr. Brown in restraints and removed him from the cell.

91.    I found upon becoming aware of the incident inside cell #11, Ofc. Wood notified staff, including medical, who responded without delay.  Upon arrival, command staff assessed the situation and determined the scene inside the cell was not safe to enter

EXHIBIT 6

and therefore attempted to get Mr. Brown to cooperate with directives in order to remove the threat.

92.     As a former Correctional Emergency Response Team (CERT) commander and instructor, I found command staff understood that time was of the essence to enter the cell due to Mr. Lane's condition being unknown and decided to conduct a tactical entry.  If Mr. Brown was in the cell by himself, staff would have had more time to negotiate an entry on Mr. Brown.

93.     I find the delay in entering the cell was appropriate and meets industry standard in their attempt to make the scene safe by having Mr. Brown get on the ground, go to the back of the cell, especially seeing he was in possession of a weapon.

94.      After entering the cell and securing the threat, being Mr. Brown, the OCDC staff allowed medical staff inside cell to assess Mr. Lane.  Case material shows Mr. Lane was removed from the cell and taken to medical where it was determined he was deceased.

## **<u>Observations</u>**

95.     Case material shows observations were missed at times in medical housing 13D on January 2, 2021.  Although missing observations of the inmate population in a correctional facility should be in compliance with state jail standards and agency policy, they do occur based on unforeseen circumstances.  I found in this case a unit observation was not conducted in 13D from 1735 until 1904.

EXHIBIT 6

96.     I find the inmates housed in 13D were not on a suicide watch and OCDC staff were not put on notice that Mr. Brown was planning on assaulting Mr. Lane.  This incident occurred during the time the covid pandemic restrictions were in place which caused many correctional facilities to temporarily change the way they managed their facility.

## **Conclusion**

To summarize, without limiting my opinions, I find the following:

- I find OCDC followed Oklahoma jail standards, OCDC policy, and satisfied generally accepted standards in corrections completing a medical triage on both Mr. Brown and Mr. Lane upon each entering OCDC.  During the triage it was determined that both Mr. Brown and Mr. Lane had medical issues that warranted them to be placed in the medical housing 13D at the OCDC and both were housed in the medical housing during their current incarceration relating to this case.

- Case material shows Mr. Brown was classified as maximum and Mr. Lane was classified as medium.  Based on my training and experience an OJC allows for the housing of maximum and medium security inmates, especially when both were being housed in a temporary situation such as medical housing.  I find both Mr. Brown and Mr. Lane therefore were capable of being housed together and attending the same programing while at OCDC.  I find OCDC were in compliance with the

EXHIBIT 6

Oklahoma jail standards, OCDC policy, and satisfied generally accepted standards in the housing of Mr. Brown and Mr. Lane.

- Mr. Brown and Mr. Lane shared the same cell from December 20, 2020, until the altercation on January 2, 2021. During this time, there is no evidence within the case material that shows Mr. Brown and Mr. Lane had any disagreements, were involved in any altercation, made threats to anyone toward the other, or requested to be removed from the cell due to being fearful of the other.

- I find it is understandable that unexpected circumstances, such as staffing shortages and changes in protocols due to the COVID-19 pandemic, impacted many correctional facilities in 2020 and 2021. The issues dealing with the COVID-19 pandemic impacted the ability to conduct regular observations and supervision in correctional facilities, including medical housing units. These challenges lead to missed observations, which should have been documented, and inmate housing changes that were outside the normal routine. I find although observations were missed in the medical housing 13D on January 2, 2021, the missed observations were documented as staff being involved in other unforeseen tasks. Based on my training and experience, in general and outside the issue with a pandemic, there are isolated instances where observations are not able to be completed in correctional facilities due to unforeseen circumstances, such as other inmate needs, and addressing inmate altercations.

EXHIBIT 6

- I find, upon being made aware of the incident in medical housing 13D cell #11 on January 2, 2021, at approximately 1904, custody and medical staff were notified and promptly responded. Upon arrival to cell #11, command staff assessed the scene and seeing that Mr. Brown was refusing to follow staff directives, determined the cell was not safe to enter the cell as a routine entry. Command staff observed Mr. Brown standing on his bunk in possession of a weapon, blood in the cell, and observing that Mr. Lane was not responding to staff and lying on the floor covered with a mat, command staff made the decision to make a tactical entry into the cell. This resulted in pepper spray being utilized and Mr. Brown being secured in restraints and removed from the cell. The scene now being safe, medical staff were allowed to enter the cell and assess Mr. Lane. Mr. Lane was then removed from the cell and taken to medical where it was determined that Mr. Lane was deceased. I find OCDC staff were in compliance with generally accepted practices in corrections by ensuring the scene was staff before entering the cell, and after securing the scene, allowed Mr. Lane to receive medical intervention.

- I find there is no evidence in the case material that shows OCDC staff were put on notice that the assault occurring on January 2, 2021, in medical housing 13D, cell #11, between Mr. Brown and Mr. Lane was going to occur.

EXHIBIT 6

97.   At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool(s), I will make them available for review, if requested, prior to their use.

98.   My fees for these professional services are based upon a $250 per hourly rate up to the point of deposition not to exceed $15,000.  My deposition preparation and testimony are compensated at a rate of $250.00 per hourly rate not to exceed $10,000.  Travel outside Kentucky includes a four-hour minimum travel fee charge. Reasonable out-of-pocket expenses are billed related to the services provided.

99.   This report presents my opinions relating to this case based on the material I have received and reviewed to this date.  Upon further documents being received, I reserve the right to alter and further expand my opinions in this report and opine on other findings within the material, if any.


Dated 17th day of May 2024.                          *Jeffrey S. Carter*
                                                     Jeffrey S. Carter

EXHIBIT 6