## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

AUSTIN BOND, as Personal Representative )
of the Estate of BRAD LANE, Deceased, )
                                  )
      Plaintiff, )
                                  )
v.                               )     Case No. CIV-23-05-D
                                  )
OKLAHOMA COUNTY CRIMINAL )
JUSTICE AUTHORITY, et al., )
                                  )
      Defendants. )

## ORDER

Defendants, Oklahoma County Criminal Justice Authority (OCCJA) and the Board of County Commissioners for Oklahoma County (the Board), have filed a joint Motion for Summary Judgment [Doc. No. 49]. Plaintiff filed a response [Doc. No. 55], to which Defendants replied [Doc. No. 57]. The matter is fully briefed and at issue.

## UNDISPUTED MATERIAL FACTS[1]

### A. Brad Lane's Detention and Death

Brad Lane was beaten to death by his cellmate while housed at the Oklahoma County Detention Center (the Jail) as a pretrial detainee. When Mr. Lane was booked in, he was wearing a medical boot from a previous ankle surgery. Mr. Lane was assigned to

---

[1] Defendants' motion for summary judgment contains 35 purportedly undisputed material facts, to which Plaintiff has responded. In his response, Plaintiff also includes 29 additional material facts. However, in Defendants' reply, they do not specifically address any of Plaintiff's additional material facts, nor do Defendants raise any hearsay or other objections to the evidence relied upon therein. Therefore, to the extent those facts are properly supported by the record, they are deemed undisputed for purposes of ruling on Defendants' motion. *See* FED. R. CIV. P. 56(e)(2) ("If a party … fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion.").

pod 13D, which was on the medical floor. Mr. Lane's intake screening form indicates that his criminal history was "exclusively non-violent." Defs.' UMF Nos. 4, 6; Pltf.'s AMF Nos. 1, 13.

Mr. Lane shared a cell with Shaquile Brown, who was being held on multiple counts of felony aggravated assault and battery. Mr. Brown had been assigned to the medical floor because he had a tracheotomy that required frequent medical care. Mr. Lane and Mr. Brown shared a cell from December 12, 2020, until Mr. Brown murdered Mr. Lane on January 2, 2021. Defs.' UMF Nos. 11, 14; Pltf.'s Resp. to UMF No. 8.

On the medical floor, officers were required to conduct visual sight checks every 30 minutes. In every other area of the Jail, if an inmate placed a call for help, the call was transferred to "camera operations," where an officer would presumably gauge the severity of the call and dispatch officers based on the situation. On the medical floor, however, calls from inmates' cells went to the nurse's station in medical and not to camera operations. The phone in the medical clinic was not manned 24/7; no one was assigned to answer the phone; and the ringer was turned down. Pltf.'s AMF Nos. 20, 28.

On January 2, 2021, Officer Melissa Wood started her shift at 6:00 p.m. and was assigned to the medical floor. During shift change, Officer Carol Richmond told Officer Wood that another inmate needed to be taken to the clinic. Before doing a sight check of the medical floor, Officer Wood took the inmate to the clinic, checked on the juvenile pod, and escorted a different inmate to do a video kiosk visit. Because Officer Wood was the only Jail staff assigned to the medical floor, no officer supervised or conducted sight checks

for the medical floor from at least 6:00 p.m. to 7:02 p.m. Defs.' UMF Nos. 26-27; Pltf.'s AMF No. 3.

Between 6:15 and 6:21 p.m., inmate Jose Hernandez heard screaming in 13D, the pod that also housed Mr. Lane and Mr. Brown.[2] Mr. Hernandez popped the lock on his cell and walked to the common area. Mr. Hernandez heard Mr. Lane yelling for help, and Mr. Hernandez went to Mr. Lane's cell and saw blood on the window. Mr. Hernandez saw Mr. Lane beaten up and attempting to cover himself with a mattress to defend himself from Mr. Brown's attack. When Mr. Hernandez saw Mr. Brown sit down, Mr. Hernandez believed the assault was over, and he returned to his cell. Defs.' UMF No. 28; Pltf.'s AMF No. 4.

Approximately five minutes later, Mr. Hernandez heard loud banging coming from Mr. Lane's cell, and he observed Mr. Brown pull Mr. Lane out from under the bunk and bludgeon him with Mr. Lane's metal medical boot in the face and head. During this time, Mr. Lane was repeatedly pleading for help. Mr. Hernandez returned to his cell and tried to call the medical clinic for help three times, but no one answered. Mr. Hernandez then called his girlfriend and told her to call the Jail's main telephone number to get Mr. Lane help. Pltf.'s AMF Nos. 5-6.

Mr. Hernandez called his girlfriend a second time, and she said she tried to call the Jail, but she was put on hold. Mr. Hernandez told her to try to call the Jail again and that staff needed to get to the 13th floor or Mr. Brown would kill Mr. Lane. During this time, Mr. Hernandez could still hear the sound of Mr. Brown repeatedly striking Mr. Lane with

---

[2] Mr. Hernandez was on the medical floor because he had four fractures in his back.

the medical boot. Mr. Hernandez went back to Mr. Lane's cell and observed Mr. Brown kneeling over Mr. Lane, who was still alive and trying to defend himself. Mr. Lane grabbed the medical boot but did not have the strength to fight back. Mr. Brown took the boot back from Mr. Lane, ignored Mr. Hernandez telling Mr. Brown to stop, and continued to strike Mr. Lane with the boot. Pltf.'s AMF No. 7; Doc. No. 55-10, at 4.

At approximately 7:02 p.m., Officer Wood returned to 13D. Other inmates notified her that they had heard yelling in Mr. Lane's cell for a while. Officer Wood continued her sight check until she got to Mr. Lane's cell. After a struggle with Mr. Brown, officers were able to extract Mr. Brown from the cell. Mr. Lane was already dead. Defs.' UMF Nos. 33-35; Pltf.'s AMF Nos. 11-12.

### B. Jail Conditions and Staffing Issues

In 2008, the U.S. Department of Justice issued an investigative report on the Jail's conditions of confinement. Among other findings, the DOJ found an "inordinately high risk of detainee-on-detainee violence at the Jail as a result of the Jail's chronic overcrowding, the staff's inability to supervise detainees, and the ability of the detainees to bypass at will the security of their cell doors." [Doc. No. 55-21, at 6]. The report further noted that "while each housing unit or floor may house upwards of 500 detainees, there are often only one or two detention officers available to supervise the large number of detainees as well as to conduct detainee sight checks." *Id.* at 4.

On May 22, 2019, Oklahoma County created the OCCJA to administer the Jail, and the OCCJA took over operations in approximately July of 2020. Pltf.'s AMF No. 16. Staff

retention has been a continual problem at the Jail since at least 2004, but the understaffing issues worsened after the OCCJA took over operations. Pltf.'s AMF No. 17.

At her deposition, Officer Wood testified that the 13th medical floor should have had three officers, two medical security officers, and one officer assigned to suicide prevention inmates, for a total of six officers [Doc. No. 55-16, at 22]. Officer Wood believed that the two medical security officers were not in the clinic on the day of Mr. Lane's murder because they were dealing with a different inmate-on-inmate situation. *Id.* at 23. Officer Wood further testified that one to two officers usually covered a floor of the Jail. *Id.* Officer Wood described "a good shift" as having two officers per floor. *Id.* at 24. At her deposition, Officer Wood stood by her previous statement that "the Jail's staffing levels were not enough to run the Jail correctly," and she added that "sometimes we'd have to run two whole floors by ourselves, just overworked to the extreme." *Id.* at 25. Finally, Officer Wood stated it was almost impossible to do all the required sight checks and duties with one officer assigned to each floor. *Id.* at 26.

Lt. Yolanda Doroteo agreed in her deposition that the Jail's understaffing was "dangerous," and that understaffing was causing an increase in inmate deaths and escapes [Doc. No. 55-11, at 5-6].

By January 2021, Lt. Andrew Reeves had worked at the Jail for approximately 17 years [Doc. No. 55-19, at 25]. At the time of Mr. Lane's death, he described staffing levels as a "crazy low number," especially since the OCCJA took over Jail operations. *Id.* Lt. Reeves stated that "with the level of staffing, the platoon had roughly 9 to 13 officers on it, and we house anywhere between 1,400 and 1,700 residents. So the staffing level just

made it difficult to deal with any kind of large situations, or if an incident happened, it would distract from the officers being able to take care of everything that they had to take care of on a day-to-day basis." *Id.* at 27. He confirmed that, with short staffing, officers could not be expected to perform all required sight checks, especially on the 13th medical floor. *Id.* at 28. Lt. Reeves further testified that it was an issue to have the inmates' phone calls route to the clinic phone, which was unmanned and turned down. *Id.* at 29. Reeves did not dispute telling the OSBI that "the phones transferring to central control instead of the clinic might have given officers a 15-minute faster response time, which could have saved Lane's life." *Id.* at 30.

Tiffany Carter was Chief of Security for the Jail at the time of Mr. Lane's murder. Ms. Carter testified that she tried to take the issue of understaffing to Greg Williams (Jail Administrator) and William Monday (Assistant Jail Administrator) in the months leading up to Mr. Lane's death [Doc. No. 55-25, at 8-9]. She testified that sometimes they told her they were working on it and, other times, they told her to make it work. *Id.* at 9. At the time of Mr. Lane's death, Ms. Carter was working with a 40% staffing level. *Id.* at 11. For perfect staffing, the Jail should have had 192 staff members, but only had 77 staff members. *Id.* She testified that the serious level of understaffing created a dangerous environment for Jail staff and inmates. *Id.* at 12. Ms. Carter testified that she felt as though there was not effective communication from Mr. Williams or Mr. Monday. *Id.* at 21. When Mr. Williams and Mr. Monday would tell her that they were hiring, she testified that "we would have these meetings of what we were going to do, how they were going to hire, but we never really did what we said we were going to do." *Id.* at 15. Finally, Ms. Carter testified that

she wrote a memo to Jail Administrators in September of 2020, in which she explained that she had never seen staffing levels as low as they were at that time. *Id.* at 20.

The Oklahoma Department of Health (OSDH) conducts regular inspections of the Jail. In February 2021, the OSDH Jail Inspection Division (JID) conducted an annual inspection and investigation of the Jail [Doc. No. 55-28]. The JID found that the Jail was not in substantial compliance with Oklahoma Jail Standards, OAC Title 310, Chapter 670. The JID report cites to incidents of inmate deaths at the Jail and noted that Jail staff repeatedly failed to conduct timely sight checks between June of 2020 and February of 2021. The JID report further found that interviews with inmates housed on the 13th floor indicated a lack of staff presence on a regular basis. The JID report also highlighted negative results with respect to inmate distress calls "with the phone either continually ringing with no response or not ringing at all." Pltf.'s AMF No. 25; Doc. No. 55-28.

Plaintiff has also supplied evidence of incidents involving other inmates in which there were allegedly corresponding failures to supervise the inmates. Plaintiff cites to Officer Kaleb Landes' interview with the OSBI, from which the OSBI reported that "the staffing levels at the Oklahoma County Jail created an environment where inmate deaths were allowed to happen because there was no option to prevent them." [Doc. No. 55-24, at 1]. In the same interview, Officer Landes relayed that an inmate had recently died in a pod with 15-minute required sight checks and was not discovered for 12 hours. *Id.* at 3. In June of 2020, a different inmate was discovered unresponsive at 5:30 p.m., after sight checks were reportedly not performed between 12:08 p.m. and 3:38 p.m., or any time after 3:40 p.m. [Doc. No. 55-30, at 4]. In December of 2020, another inmate was reportedly assaulted

by other inmates for approximately 15 minutes before a detention officer arrived on the floor. [Doc. No. 55-32, at 2-3]. Regarding inmate distress calls, Officer Landes stated to the OSBI that "[t]here were times when officers did not respond to calls for hours." [Doc. No. 55-24, at 1].

## STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id.* at 255. The inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## DISCUSSION

### I.    Legal Framework – Municipal Liability Under 42 U.S.C. § 1983

Plaintiff asserts his claims under 42 U.S.C. § 1983, alleging that Mr. Lane's rights were violated while detained at the Jail. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

8

Generally, a local government may not be held liable under § 1983 "for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978). Rather, where a plaintiff seeks to hold a local governmental entity liable under § 1983, he must also show that a municipal policy or custom "was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). Specifically, a plaintiff must demonstrate 1) an official policy or custom; 2) causation; and 3) deliberate indifference. *See Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th Cir. 2023).

## II.     Underlying Constitutional Violation

The Constitution imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quotation omitted). Indeed, "[h]aving incarcerated persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* (internal quotation marks and citation omitted) (alterations in original). Of course, the mere fact that a prisoner suffered injury at the hands of another prisoner does not "translate[] into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 824. Rather, to prevail on a failure to protect claim, a plaintiff must show "that he was incarcerated under conditions posing a substantial risk of serious harm," and the defendant acted with deliberate indifference, meaning the defendant "was aware of and disregarded an excessive risk to inmate health or safety by failing to take reasonable measures to abate

9

the risk." *Lopez v. LeMaster*, 172 F.3d 756, 761 (10th Cir. 1999) (internal quotation and citation omitted).

In their motion, Defendants argue that Plaintiff has failed to establish that Mr. Lane was "incarcerated under conditions posing a substantial risk of serious harm." *See Lopez*, 172 F.3d at 760. Defendants contend that claims arising from inmate-on-inmate violence generally require evidence of either direct threats to the victim leading up to the violence; evidence that the victim was particularly vulnerable to attacks by other inmates because of some personal characteristic or membership; or evidence that the assailant had a recent history of violent or disruptive behavior. Defs.' Mot. at 12-13.

In making this argument, Defendants present an overly restrictive view of the relevant case law and misconstrue Plaintiff's claim. First, as the Court has stated previously [Doc. No. 18, at 8], knowledge of specific threats or an inmate's individual risk is not necessarily required. *See Farmer*, 511 U.S. at 843 ("[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation faces such a risk."); *see also Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) ("The official's knowledge of the risk need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury might occur."); *Lopez*, 172 F.3d at 762, n.5 ("Even if Sheriff LeMaster was unaware of the specific risk to appellant from his cellmates, this does not relieve him from liability.").

Further, Plaintiff's claim against Defendants is largely premised on "the failure to provide any supervision of the 13th floor during the assault and after Mr. Lane repeatedly

screamed for help." Compl., at 7. Plaintiff attributes this failure to Defendants' longstanding history of understaffing and overcrowding the Jail and a systemic failure to address the known problems. Accordingly, the assertions that Mr. Brown did not have a history of being violent with Jail staff or other detainees, or that Mr. Brown and Mr. Lane shared a cell without incident for the twenty days leading up to the murder, do not absolve Defendants of liability.

Upon consideration of the summary judgment record, the Court finds that a reasonable jury could conclude that Mr. Lane's constitutional rights were violated by a systemic failure. Courts have held that a systemic failure can serve as the underlying constitutional violation for purposes of *Monell* liability. *See Lucas,* 58 F.4th at 1144 ("[I]t was error for the district court to not consider a systemic failure as the underlying constitutional violation."). "Because municipalities act through officers, ordinarily there will be a municipal violation only where an individual officer commits a constitutional violation." *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1191 (10th Cir. 2020). However, there is a limited exception to the individual action requirement "where the alleged violation occurred as a result of multiple officials' actions or inactions." *Id.*

In this case, Plaintiff has set forth evidence that severe understaffing at the Jail was a longstanding and pervasive problem, known to the OCCJA and Jail staff, and that the OCCJA knew that such understaffing posed excessive risk of inmate-on-inmate violence. Additionally, there is sufficient evidence for a reasonable jury to infer that an excessive risk of inmate-on-inmate violence – paired with severely low staffing levels – would make it impossible for Jail staff to reasonably respond to inmate distress calls. This is especially

true on the 13th medical floor, given that the Jail routed medical-floor inmates' distress calls to the unmanned and unanswered phone in the medical clinic. Viewing all facts and reasonable inferences in favor of Plaintiff, the Court finds that Plaintiff has demonstrated disputed material facts with respect to whether Mr. Lane suffered an underlying constitutional violation.[3]

### III. Municipal Liability - OCCJA

As stated above, to establish municipal liability for a constitutional violation, a plaintiff must demonstrate 1) an official policy or custom; 2) causation; and 3) deliberate indifference. *See Lucas*, 58 F.4th at 1145 (10th Cir. 2023).

#### a. Official Policy or Custom

An official policy or custom may take many forms, to include "a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees." *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1239-40 (10th Cir. 2020) (quoting *Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017)).

On this point, Defendants merely argue that *the Board* cannot be held liable "because the OCCJA is a legally separate entity over which the Board has no control over

---

[3] Defendants also argue that Plaintiff cannot show systemic failures with respect to the Jail's funding or inmates' housing assignments. In response, Plaintiff concedes that he is not asserting those issues as distinct grounds for liability. Rather, Plaintiff's claims center on the purported systemic failures of severely understaffing the Jail and failing to monitor inmates.

its employees or policies." Defs.' Mot. at 18. Of course, both the Board and the OCCJA are parties to this litigation. Without making any substantive argument regarding an official policy or custom of the OCCJA, Defendants appear to have conceded the issue as to the OCCJA. Viewing the facts and reasonable inferences in the light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that the OCCJA maintained an official policy or custom of understaffing the Jail and failing to monitor inmates.

### b. Causation

"To establish the causation element, the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'" *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 770 (10th Cir. 2013) (citation omitted). In their motion, Defendants argue that Plaintiff has not demonstrated a causal connection between Plaintiff's death and the OCCJA's purported custom of understaffing and failing to monitor inmates. In support of their argument that Mr. Lane's death was not caused by any staffing or sight check issue, Defendants refer to Tiffany Carter's testimony that Mr. Lane's death was "a spontaneous and serious incident that was not predictable." Defs.' Mot. at 25.

In response, Plaintiff contends that the Jail's insufficient staffing and monitoring of inmates created the conditions for Mr. Brown's extended bludgeoning and murder of Mr. Lane. Specifically, Plaintiff asserts that: had Mr. Lane's pod been sufficiently staffed, "timely intervention would have occurred quickly after Mr. Lane's first cry for help"; had the officers performed the requisite 30-minute sight checks, the assault would not have escalated into an extended and lethal bludgeoning; Lt. Doroteo agreed that understaffing

was causing an increase in inmate deaths at the Jail; and the multicounty grand jury report listed "the failure of detention officers to conduct proper [sight] checks on inmates" as one major issue leading to inmate deaths. Additionally, with respect to the Jail's custom of routing inmate distress calls from Mr. Lane's pod to "a phone in medical that was not manned or routinely answered," Plaintiff cites to an interview response given by Lt. Reeves that routing inmate distress calls to central control instead might have given officers a 15-minute faster response time, which could have saved Mr. Lane's life. Further, the summary judgment record demonstrates that Mr. Lane's murder was not the result of a brief attack, in which case the argument might be made that even 30-minute sight checks could not have saved Mr. Lane's life. Rather, Mr. Lane was beaten to death over a period of 30-45 minutes, during which two 30-minute sight checks were missed and there was no officer supervision on the floor. There is also evidence in the record that Mr. Hernandez saw Mr. Lane alive and attempting to fight back for much of the beating, which could also lead a reasonable jury to conclude that proper staffing and timely sight checks would have stopped the assault from extending into a lengthy bludgeoning and murder. Upon careful consideration of the summary judgment record, the Court finds that a reasonable jury could determine that the OCCJA's custom of understaffing the Jail and failing to monitor inmates was closely related to Mr. Lane's murder.

### c. Deliberate Indifference

Deliberate indifference in the municipal liability context "may be satisfied when the [defendant] has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to

14

disregard the risk of harm." *Layton v. Bd. of Cnty. Comm'rs of Okla. Cnty.*, 512 F. App'x 861, 871 (10th Cir. 2013) (unpublished); *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) ("In the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it."). While notice is typically established "by proving the existence of a pattern of tortious conduct," deliberate indifference may also be found "absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]" *Barney*, 143 F.3d at 1307-08 (quotation marks and citation omitted).

In their motion, Defendants contend that Greg Williams (Jail Administrator) made various efforts between July 1, 2020, and January 19, 2023, to address the Jail's understaffing. However, as noted by Plaintiff, Mr. Williams' affidavit does not include dates for his purported efforts to address the Jail's staffing levels, leaving the Court unable to determine whether Mr. Williams made any reasonable efforts to address understaffing *prior to* Mr. Lane's death in January of 2021. Further, Plaintiff has provided evidence that the OCCJA knew of the dangers associated with understaffing the Jail prior to Mr. Lane's death; that Jail staff repeatedly raised the dangers of understaffing to Jail Administrators; that Jail Administrators told the Jail staff to "make it work"; that a few months prior to Mr. Lane's death, the Jail's Chief of Security sent the Jail Administrators a memorandum, explaining that staffing levels were as low as she had ever seen; and that, when Jail Administrators met with Ms. Carter to discuss hiring efforts, "we never really did what we said we were going to do." [Doc. No. 55-25, at 9- 15].

Viewing all facts and reasonable inferences in the light most favorable to Plaintiff, a jury could conclude that a violation of a pretrial detainee's Fourteenth Amendment rights is a plainly obvious consequence of the purported customs of severely understaffing the Jail, failure to monitor inmates, and failure to respond to inmate distress calls; and that the OCCJA was deliberately indifferent to conditions at the Jail. For these reasons, Defendants' Motion for Summary Judgment is **DENIED** as to the OCCJA.

## IV.    Municipal Liability – The Board

With respect to the Board, the Court has previously rejected the notion that the Board cannot be held liable as a matter of law merely because the Jail is operated by the sheriff or, in this case, the OCCJA. *See Kauble v. Bd. of Cnty. Comm'rs of Okla. ex rel. Okla. Cnty. Sheriff's Off.*, Case No. CIV-17-729-D, 2018 WL 912285, at *3-4 (W.D. Okla. Feb. 15, 2018) ("Under Oklahoma law, a county is a suable entity that is sued through its board of county commissioners. … [D]etermining a party's responsibility for a policy that leads to a federal rights violation involves a fact-specific inquiry, and although a county's sheriff has charge and custody of the Jail, the board of commissioners sets policies, including fiscal policies, that may be implicated in a violation of a county inmate's federal rights.").

However, Plaintiff cites to no authority for the proposition that the Board is automatically liable on the same evidence supplied for municipal liability against the OCCJA. Throughout Plaintiff's response, he combines the OCCJA and the Board, but almost all specific evidence to establish municipal liability references the OCCJA or Jail Administrators (Greg Williams and William Monday). For instance, Plaintiff focuses on

16

the knowledge of the leaders of the OCCJA with respect to systemic problems at the Jail; the OCCJA's failure to remedy the understaffing issue in light of this knowledge; and the fact that Mr. Williams' efforts to hire additional staff were not reasonable. In response to Defendants' argument that Plaintiff has failed to evince a policy of the Board, such as failure to provide the OCCJA with sufficient funding to respond to the understaffing crisis, Plaintiff merely concedes that he is not seeking a failure-to-fund theory. This is insufficient to survive summary judgment as to the Board. To be sure, the Court is not ruling that the Board cannot be held liable for constitutional violations that occur at the Jail. But merely treating the OCCJA and the Board as one party is insufficient at the summary judgment stage. Although the County's creation of the OCCJA in "no way guarantees immunity to [Oklahoma] County," Plaintiff must still demonstrate a disputed material fact with respect to his claim against the Board. Upon consideration of Plaintiff's summary judgment briefing, he has failed to do so. *Chichakli v. Samuels*, Case No. CIV-15-687-D, 2016 WL 2743542, at *4 (W.D. Okla. May 11, 2016).

## CONCLUSION

Defendants' Motion for Summary Judgment [Doc. No. 49] is **DENIED** as to the Oklahoma County Criminal Justice Authority and **GRANTED** as to the Board of County Commissioners for Oklahoma County. Final judgment in favor of the Board and against Plaintiff will be entered at the conclusion of the case. The remaining parties shall propose deadlines for the remaining scheduling order deadlines within 10 days of this Order.

**IT IS SO ORDERED** this 11th day of March, 2025.

TIMOTHY D. DeGIUSTI
Chief United States District Judge